Christopher K. Kiplok
Dustin P. Smith
Erin E. Diers
Elizabeth A. Beitler
**HUGHES HUBBARD & REED LLP**
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000

*Counsel to the Joint Managers of*
*Euro Exchange Securities UK Limited*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>Euro Exchange Securities UK Limited,<br><br>     Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 26-_____ |

**DECLARATION OF JAMES BENNETT IN SUPPORT OF THE**
**(I) VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING**
**AND RELATED RELIEF AND (II) EMERGENCY MOTION FOR ENTRY OF ORDERS**
**GRANTING (A) *EX PARTE* RELIEF AND (B) PROVISIONAL RELIEF**
**PURSUANT TO SECTION 1519 OF THE BANKRUPTCY CODE**

Pursuant to 28 U.S.C. § 1746, I, James Bennett, hereby declare as follows:

1.  I am a Senior Managing Director with Teneo Financial Advisory Limited and have, along with my colleague Duncan Perring, been appointed joint managers ("Joint Managers") of Euro Exchange Securities UK Limited (the "Company" or the "Debtor"), a company incorporated in England and Wales against which an application for special administration was filed before the High Court of Justice, Business and Property Courts of England and Wales, Insolvency and Companies List (ChD) (the "UK Court") in case number CR-2026-004370 (the "UK Proceeding") on June 2, 2026. On June 4, 2026, the UK Court entered an interim order pending the final determination of the application appointing me and Mr. Perring as Joint Managers (such order,

along with any amendments thereto, the "UK Order").  A true and correct copy of the UK Order is attached hereto as **Exhibit 1**.  Pursuant to the terms of the UK Order, I am fully authorized to act as the foreign representative of the Debtor and commence this chapter 15 case (the "Chapter 15 Case").

2.    I submit this declaration (this "Declaration") in support of (i) the *Verified Petition for Recognition of Foreign Main Proceeding and Related Relief* (the "Chapter 15 Petition"), filed contemporaneously herewith, seeking, among other things, recognition by this Court of the UK Proceeding as a "foreign main proceeding" under section 1517 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code") and certain related relief and (ii) the *Emergency Motion for Entry of Orders Granting (A) Ex Parte Relief and (B) Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* (the "Provisional Relief Motion"), filed contemporaneously herewith, seeking, among other things, injunctive relief giving effect to the automatic stay provisions pursuant to section 362 of the Bankruptcy Code prior to recognition.  This Declaration also sets forth certain information required by section 1515(c) of the Bankruptcy Code and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.    I make this Declaration on the basis of (a) my personal knowledge; (b) my review of relevant documents including, among other things, the documents prepared and/or filed in connection with the UK Proceeding and this Chapter 15 Case; and (c) my opinion based upon my experience and knowledge of the history and financial condition of the Debtor.  Where I refer to facts which are based on information provided by others, such information is true to the best of my knowledge and belief.  I am duly authorized to submit this declaration on behalf of the Debtor, and if called upon to testify, I could and would testify competently to the facts set forth herein.

## BACKGROUND

### A.    The Company's Business and Operations

4.    The Debtor was incorporated in England and Wales under the Companies Act 1985 on October 25, 2007 with company number 06409565.  Its registered office is located at 107 Great Portland Street, London, United Kingdom W1W 6QG.

5.    I understand that the Debtor originally operated as a money services business focusing on currency exchange and remittance services.  Since then, the Debtor's business has evolved, and it is now an authorized electronic money institution, licensed by and subject to the supervision of the United Kingdom's Financial Conduct Authority (the "FCA").  The Debtor currently provides currency exchange, payment services, and electronic money services to its customers, enabling them to transmit funds electronically to different countries and in different currencies.

6.    The Debtor is wholly owned by Luis Alberto Gasparini, Sr.  Mr. Gasparini, Sr. and certain members of his family own several other companies, also in the money service business.  Collectively, these companies are known as the "Euro Exchange Financial Group."  Although these companies operate in coordination with one another to facilitate the transmission of funds between different jurisdictions and in different currencies, ownership of the different companies comprising the Euro Exchange Financial Group appears to be independent.

7.    The Debtor's board is composed of three directors:  Mr. Gasparini, Sr., his son (Luis Alberto Gasparini, Jr.), and Sasha Ramjiawan.  Based on available information, I understand that the majority of the Debtor's board have residential and contact addresses in the United Kingdom.

8.    In addition, the Debtor also maintains several bank accounts in the United Kingdom and the United States, as well as other locations worldwide.  Based on information provided to me by the FCA, I currently understand the Debtor's banking relationships are as follows:

3

| Provider | Jurisdiction | Currency | Balance | Account Type |
|---|---|---|---|---|
| Bank of London | United Kingdom | GBP | -[1] | Safeguarding |
| | | GBP | -[1] | Safeguarding |
| | | GBP | 27,395.89[1] | Operational |
| Banking Circle | Luxembourg | EUR | 48,492.98[2] | Safeguarding |
| | | GBP | 536.21[2] | Safeguarding |
| | | GBP | 164,411.46[2] | Safeguarding |
| | | EUR | 5,196,648.29[2] | Safeguarding |
| | | GBP | 136.44[1] | Operational |
| | | GBP | 86,208.19[1] | Operational |
| | | EUR | 297,066.93[1] | Operational |
| CaixaBankNow | Spain | CAD | 4,346.97[2] | Safeguarding |
| | | GBP | 1,854,874.03[2] | Safeguarding |
| | | USD | 1,652,145.12[2] | Safeguarding |
| | | EUR | 4,439,569.83[2] | Safeguarding |
| | | GBP | 1,163.15[1] | Operational |
| | | EUR | 490,780.42[1] | Operational |
| | | USO | 360,416.86[1] | Operational |
| Community Federal Savings Bank | New York, USA | USD | 67,044.99[2] | Safeguarding |
| | | USD | 18,009.13[2] | Safeguarding |
| | | USD | 24,352,311.51[2] | Safeguarding |
| | | USD | 383,943.98[1] | Operational |
| ClearBank | United Kingdom | GBP | 2,157.53[1] | Operational |
| | Malta | EUR | 72.07[1] | Operational |

A number of the Debtor's bank accounts are held in the United Kingdom.  However, a significant proportion of the Debtor's cash is maintained in bank accounts at a U.S. bank located in New York, Community Federal Savings Bank ("CFSB," and such accounts, the "US Bank Accounts").[3]  The

---

1.  Balance as of January 28, 2026.

2.  Balance as of March 17, 2026.

3.  CFSB is also subject to regulatory oversight due to concerns regarding deficiencies in its Bank Secrecy Act/Anti-Money Laundering compliance program.  *See* Consent Order against Community Federal Savings Bank, dated April 24, 2026, available at https://www.occ.gov/news-issuances/news-releases/2026/nr-occ-2026-40.html.

Debtor also owns U.S. real property located at 3255 Franklin Avenue, V3, Coconut Grove, Florida 33133.

9.    Certain of the Debtor's customers, including its largest customer by volume, Euro Exchange International Bank (now known as Banex), are located in Puerto Rico.

**B.    FCA Supervision and Events Leading to the Commencement of the UK Proceeding**

10.    Since 2020, the Company has been subject to sustained supervisory engagement by the FCA due to perceived weaknesses and inadequacies in its policies and procedures relating to financial crime controls and adherence to relevant regulations, including the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 (the "MLRs").  I understand that the FCA has also raised concerns regarding the high-risk nature of several of the Company's customers and the Company's failure to report suspicious customer activity, and that the FCA has concerns in relation to the Company's safeguarding systems and controls for client money.

11.    I also understand that, due to the Company's failure to meaningfully correct its regulatory adherence since supervisory engagement commenced, the FCA determined that the Company's activities may have resulted in widespread breaches of the requirements of the MLRs. Further, I understand that the FCA has expressed concerns that companies in the Company's network and clients of the Company have been linked to money laundering (or the failure to prevent it) and that assets of the Debtor may be linked to crime.  Finally, I understand that the FCA is concerned that, based on their historical conduct, the Company or its employees may seek to circumvent applicable regulations in order to access the assets of the Company; potentially to put them beyond the reach of the Joint Managers.

12.     As a result of this failure to improve its adherence to prevailing regulations, on June 2, 2026, the FCA, in accordance with their powers under English law, imposed certain regulatory measures which restricted the Debtor's ability to conduct its regulated activities.

13.     As a result of the imposition of restrictions on the Company's only authorized business activities pursuant to, and in accordance with, its powers under applicable law, the Company is restricted from conducting its regulated activities, is (or will imminently be) in default of its obligations under contracts relating to the performance of its regulated activities and so is inevitably in default of one or more obligations to pay a sum due and payable under a contract for electronic money issuance or payment services. As a result, the FCA considered that the Company would likely be rendered insolvent or otherwise unable to pay its debts within the meaning of the relevant provisions of English law ("Ground A"). Moreover, taking into account the Company's failure to meaningfully correct its regulatory adherence over the past six years, the FCA concluded that it would be fair to place the Company into special administration ("Ground B").

14.     In light of the above, on June 2, 2026, the FCA applied to the UK Court for the appointment of special administrators pursuant to the Payment and Electronic Money Institution Insolvency Regulations 2021 (S.I. 2021/716) (the "PESAR Regulations") on the basis of Ground A and/or Ground B. The key objectives of this type of special administration are to return customer funds as soon as possible, ensure timely engagement with payment system operators, and to either (a) rescue the company as a going concern, or (b) wind it up in the best interests of creditors, in order to achieve the best result overall for customers and creditors. Among other things, the FCA considered that the appointment of special administrators was necessary to: (i) take over the Company's business to mitigate the risk of non-compliance with the relevant regulatory regimes to which the Company is subject and the restrictions on the Company imposed by the FCA;

6

(ii) divest Mr. Gasparini, Sr. and his family of management control of the Company and transfer such control to the special administrators, who act as officers of the UK Court; (iii) identify and preserve the Company's assets, books and records; (iv) conduct a reconciliation of the Company's funds to ensure that any funds which may represent the proceeds of crime are identified and appropriately reported to the authorities; and (v) distribute monies appropriately to legitimate customers once money laundering concerns in respect of such customers have been properly resolved.

15.    Accordingly, on June 2, 2026, the FCA applied to the UK Court, pursuant to the PESAR Regulations, to put the Company into special administration proceedings on the basis of Ground A and/or Ground B.

16.    On June 4, 2026, following an *ex parte* hearing, the UK Court entered an interim order pending the final determination of the FCA's application, which, among other things, appointed Duncan Perring and I as joint managers and authorized us to "commence such action in [England] or abroad for the recognition, protection and/or for the recovery of documents or assets as may be required . . . including, without limitation, to apply to any foreign court (wherever situated) for recognition of their appointment or in connection with any other proceedings in order to take advantage of any insolvency, bankruptcy or other protections that such foreign law, procedures or proceedings may provide in connection with such purposes (including, without limitation, to apply for Chapter 15 US Bankruptcy Code relief)." UK Order, Sched. 1, ¶ 7. A hearing to determine whether Mr. Perring and I will be appointed as special administrators on a final basis has been scheduled for June 11, 2026. UK Order ¶ 7. If we are appointed special administrators on a final basis by order of the UK Court, our duties and powers will thereby be

conferred on us pursuant to the PESAR Regulations and certain other provisions of English insolvency law applied and modified by the PESAR Regulations.

## THE CHAPTER 15 CASE

17.     Through my advisors, I have filed the Verified Petition, which seeks final relief in aid of the UK Proceeding, recognition of the UK Proceeding as a foreign main proceeding in the United States, and turnover of the US Bank Accounts to the Joint Managers under section 1521(a)(5) and (b).

18.     Through this Chapter 15 Case, the Joint Managers seek to give effect to the UK Proceeding in the United States and to ensure an orderly and consistent management of the Debtor's affairs in both the United Kingdom and in the United States.

19.     Recognition in the United States is essential for the Joint Managers to fulfill the mandate for which they have been appointed by the UK Court.  As noted above, a significant proportion of the Debtor's cash is held in the US Bank Accounts and the Debtor owns other property in the United States.  Without giving effect to the UK Order and removing access to the US Bank Accounts by Debtor's management, there is a risk that the funds in the US Bank Accounts may be improperly dissipated.  Absent an implementing order of a U.S. court, I understand that a U.S. bank or other U.S. counterparties may not respect the authority conferred on the Joint Managers by the UK Order.

20.     If the cash held in the US Bank Accounts was disbursed outside of the Joint Managers' control, it would impair the ability of the Joint Managers to conduct an orderly proceeding to return customer property and may permit suspected proceeds of criminal activity to transfer to high-risk customers of the Debtor.  Any delay in recognition in the United States would impair the Joint Managers ability to administer the Debtor's estate in a coordinated and value-

8

maximizing manner and would create opportunities for interested parties to exploit gaps in cross-border protection.

21.    Through recognition of the UK Proceeding, the Joint Managers seek to prevent any further evasion of the relevant U.K. regulatory schemes aimed at ensuring the integrity of U.K. financial systems, reducing the risk of financial crime and money laundering, and to protect customer funds.

**The Need for Emergency and Provisional Relief Pending Recognition**

22.    I understand from our U.S. counsel that recognition of the UK Proceeding will require at least 21 days' notice of the recognition hearing and that, as a result, recognition cannot be granted for several weeks at the earliest.  In the interim, the Joint Managers will have no standing or enforceable authority under U.S. law, and the Debtor's U.S. assets will be unprotected by any court order in this jurisdiction.

23.    In my professional judgment, the Debtor's assets cannot safely remain unprotected during this period.  Without emergency and provisional relief from this Court, the Joint Managers cannot compel U.S. financial institutions and other counterparties to engage with the Joint Managers rather than with persons purporting to act on behalf of the Debtor without authorization. For these reasons, I believe the emergency and provisional relief sought in the Provisional Relief Motion is necessary to enable the Joint Managers to protect the Debtor's assets during this critical stabilization period.

**Waiver of the 14-Day Stay of Effectiveness**

24.    I understand from U.S. counsel that, upon recognition, Bankruptcy Rule 1018 ordinarily imposes a 14-day stay before the recognition order takes effect.  This would create a second gap—after recognition is granted but before the automatic stay applies—during which the Debtor's U.S. assets would again be unprotected.  For the same reasons set forth above, I do not

9

believe the Debtor's assets can safely remain unprotected for any additional period. The circumstances described in this declaration make any delay in the effectiveness of recognition a material risk to the estate.

25. For these reasons, I respectfully submit that this Court waive the 14-day stay of effectiveness and grant immediate recognition of the UK Proceeding as a foreign main proceeding, together with all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code, including the imposition of the automatic stay within the United States.

## CONCLUSION

26. Based on the foregoing, I believe that the relief being requested at the outset of this Chapter 15 Case is well-justified, necessary under the circumstances, in the best interests of the Debtor, its customers, and its creditors, and should be granted.

*     *     *

Docusign Envelope ID: A32BD9F7-8110-8D44-83CE-5CF347210EAB

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of June, 2026

Signed by:

A77ABF4BC6634D2...

James Bennett
Interim Joint Manager
Euro Exchange Securities UK Limited

11

**EXHIBIT 1**

**UK Order**

CR-2026-004370

CR-2026-004370

**HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**INSOLVENCY AND COMPANIES LIST (ChD)**

**Before:**       **Mr Justice Cawson**

**Dated:**        **4 June 2026**

**IN THE MATTER OF EURO EXCHANGE SECURITIES UK LIMITED (COMPANY NUMBER 06409565)**

**AND IN THE MATTER OF THE PAYMENT AND ELECTRONIC MONEY INSTITUTION INSOLVENCY REGULATIONS 2021**

---

### ORDER APPOINTING INTERIM MANAGERS

---

**UPON THE APPLICATION OF** the Financial Conduct Authority (the "**FCA**"), of 12 Endeavour Square, London E20 1JN, dated 2 June 2026, made pursuant to the Payment and Electronic Money Institution Insolvency Regulations 2021 (the "**Regulations**") for the appointment of special administrators to Euro Exchange Securities UK Limited whose registered office is 107 Great Portland Street, London, United Kingdom, W1W 6QG and registered number 06409565 (the "**Company**") (the "**Application**")

**AND UPON** the FCA's application for an interim order to be made pursuant to regulation 10(1)(d) of the Regulations

**AND UPON READING** the first witness statement of William Walsh and the consents to act of Duncan Perring and James Bennett

**AND UPON HEARING** Richard Fisher KC and Charlotte Cooke, Counsel for the FCA

1

**AND UPON THE COURT BEING SATISFIED** on the evidence before it that there is at least a good prima facie case for saying that one or more of the grounds for the making of a special administration order under regulation 9 of the Regulations is satisfied and that a special administration order will be made on the Application and that it is appropriate to make this interim order pending determination of the Application

**AND UPON THE COURT BEING SATISFIED** that the Company is an English company, with its registered office in England and that these proceedings would be main proceedings by reason of the presumption in article 3 of the EU Regulation on Insolvency Proceedings if applicable

**IT IS ORDERED THAT:**

1.  The hearing on 4 June 2026 shall take place in private pursuant to rule 39.2(3) of the Civil Procedure Rules 1998.

2.  The requirement to give notice to the Company is dispensed with.

3.  Pursuant to rule 189 of the Payment and Electronic Money Institution Insolvency (England and Wales) Rules 2021 (the "**PESAR Rules**") documents on the court file may not be obtained from the court files without the Court's prior permission.  Any application for permission is to be made on 48 hours' prior written notice to the FCA and the Joint Managers.

4.  With effect from the time and date specified in paragraph 5 below, and until further order of the Court, Duncan Perring and James Bennett of Teneo Financial Advisory Limited, The Carter Building, 11 Pilgrim Street, London, EC4V 6RN are appointed as joint interim managers of the Company pursuant to regulation 10(1)(d) of the Regulations (the **"Joint Managers"**).

5.  The appointment of the Joint Managers takes effect at 16.45 on 4 June 2026.

6.  For the purpose of preserving and protecting the business, property, records and relevant funds of the Company, maintaining continuity so far as appropriate, and enabling the special administration objectives under the Regulations to be achieved if

a special administration order is made (including, without limitation, the return of relevant funds as soon as is reasonably practicable) until the Return Date specified in paragraph 7 below, or further Order:

(1) the affairs, business and property of the Company shall be managed by the Joint Managers;

(2) any act required or authorised under any enactment or this Order to be done by any or all of the Joint Managers may be done by any one or more of the persons for the time being holding that office;

(3) the Joint Managers are officers of the Court;

(4) subject to paragraph 6(12) below, the Joint Managers are to have and may exercise all the management powers of any member, director, officer, manager and/or employee of the Company and in doing so will act as agents of the Company;

(5) subject to paragraph 6(6) below, the Joint Managers may do anything necessary or expedient for the management of the affairs, business and property of the Company;

(6) the function of the Joint Managers is to protect and preserve (but not to distribute) the business and assets of the Company and any relevant funds in which clients of the Company are or may be interested pending determination of the Application, and the Company under the management and control of the Joint Managers is to cease all regulated activity save with the consent of the FCA (which consent may be either specific or general);

(7) the Joint Managers further have the powers set out in Schedule 1 to the Insolvency Act 1986, which they would have if they were appointed as special administrators of the Company, save that they are not to sell or otherwise dispose of any property of the Company (or of any relevant funds) without further direction of the Court;

(8) without prejudice to the generality of the foregoing, the Joint Managers are to have the further and/or specific powers and functions set out in the Schedule to this Order;

3

(9) no person shall withdraw, transfer, encumber or otherwise deal with any bank account, safeguarding account, relevant funds account, or other account holding monies of the Company or relevant funds, save with the written consent of the Joint Managers;

(10)    the members, directors, officers, managers and employees of the Company are to cooperate fully with the Joint Managers and are to provide such information, books, records, passwords, access credentials, devices and assistance as the Joint Managers may request;

(11)    while this Order is in force, and subject to paragraph 6(12) below, no member director, officer, manager or employee of the Company is to exercise any management power without the prior consent of the Joint Managers (and for this purpose: (a) a "management power" is any power which could be exercised so as to interfere with the exercise of the Joint Managers' powers (including, without limitation, any powers in respect of the operation of, management, access to, and withdrawals from, any bank account, safeguarding account, relevant funds account or other account of the Company or holding relevant funds), and (b) consent may be general or specific);

(12)    nothing in paragraph 6(11) above shall affect the continuing ability of a member or director of the Company to exercise a management power on behalf of the Company solely insofar as is necessary in order to take legal advice or give instructions to solicitors or counsel in connection with the Application and/or any application to vary, set aside or appeal this Order or in connection with any other proceedings commenced by the FCA to which the Company is party in connection with any application to vary, set aside or appeal this Order or in connection with any challenge to the requirements imposed by the FCA on the Company;

(13)    there be liberty to apply for the payment of costs for the purpose of taking legal advice or giving legal instructions or funding legal proceedings as contemplated in paragraph 6(12) above, unless agreed by the Joint Managers.

4

7. The Application is adjourned to 10.30am on 11 June 2026 for determination or further direction ("**the Return Date**") before Mr Justice Cawson in the Interim Applications List (if possible).

8. The FCA shall give the Company notice of this Order forthwith upon it coming into effect and shall serve on it at the Company's registered address the application notice, the  FCA's skeleton argument, the evidence filed in support, together with exhibits, a note of the hearing of 4 June 2026 and this Order as soon as reasonably practicable.

9. The Company may on not less than 48 hours' prior written notice to the FCA and the Joint Managers apply to set aside or vary this Order.

10. The Joint Managers and the FCA are to be at liberty to advertise the making of this Order in such manner as they consider fit.

11. Any bank, payment services provider, safeguarding institution, custodian, outsourced service provider, cloud or information technology provider, domain registrar, telecommunications provider, or other person holding books, records, systems access, monies or assets of or for the Company shall, upon being shown a sealed copy of this Order, provide the Joint Managers forthwith with such access, information, records and assistance as the Joint Managers may reasonably require for the purposes of this Order.

12. The FCA's costs of and associated with its application are reserved to the hearing of the Application.

Dated: 4 June 2026

**SCHEDULE**

**Powers and Functions of the Joint Managers**

1. To enter upon the Company's present or former premises and for the avoidance of doubt any other premises held out and/or utilised by the Company as a registered office and/or as a trading address (whether under its present name or any former or trading name) and to locate, protect, secure, take possession of, collect, get in and protect all the property and assets (of whatever nature) of the Company including any relevant funds, any third party or trust monies, or any other monies or assets in the possession of or under the control of the Company in this country or abroad, such monies or assets not to be distributed or parted with until further Order except pursuant to the functions and powers hereby conferred.

2. To locate, protect, secure, take possession of, collect, get in and secure the books, papers and records of the Company (whether in paper or digital form) including the accounting and statutory records, passwords, credentials and back-up media.

3. To do all such things as may be necessary or expedient for the protection of the Company's property or assets and/or the value thereof, or of any relevant funds or other monies or assets in respect of which the Company has possession, mandate or control.

4. To compromise claims with any creditors or debtors of the Company without further order.

5. To investigate the affairs of the Company and obtain such information as may be necessary to locate, protect, secure, take possession of, collect and get in the assets of the Company including any relevant funds, any third party or trust monies, or any other assets in the possession or under the control of the Company.

6. To investigate insofar as it is considered necessary (with a view to tracing and protecting the assets of the Company) any transactions entered into by the Company and/or any dispositions made by the Company which may have resulted in and/or involved the dissipation and/or reduction in value of all or any of the Company's assets or of any relevant funds which in the event that a special administration order,

7

administration order or winding up order is made may be avoidable and/or recoverable pursuant to the provisions of the Insolvency Act 1986 or at law.

7. Without prejudice to the generality of the foregoing, to commence such action in this country or abroad for the recognition, protection and/or for the recovery of documents or assets as may be required and to seek such interlocutory relief therein as they shall think fit for the purposes set out in paragraphs 1 to 6 above, including, without limitation, to apply to any foreign court (wherever situated) for recognition of their appointment or in connection with any other proceedings in order to take advantage of any insolvency, bankruptcy or other protections that such foreign law, procedures or proceedings may provide in connection with such purposes (including, without limitation, to apply for Chapter 15 US Bankruptcy Code relief).

8. To cooperate with (and where relevant to seek cooperation of) the FCA, the Police, HM Revenue & Customs, the Companies Investigation Branch of the Department for Business & Trade, the Information Commissioner's Office, and any other regulatory, investigating or prosecuting authority (whether in this country or abroad) which may reasonably require the provision of information and/or the safeguarding of evidence regarding the affairs of the Company.

9. The Joint Managers are entitled to be paid their proper costs, expenses and disbursements, to be determined as set out below, or otherwise by the Court:

   (1) If a special administration order is made on the Application, the remuneration, costs, expenses and disbursements of the Joint Managers are to rank as pre-administration costs and are to be determined pursuant to Rule 100 of the PESAR Rules;

   (2) If a special administration order is not made on the Application:

      (a) the remuneration, costs, expenses and disbursements of the Joint Managers are to be determined by the Court in accordance with the procedure in Part Six of the Insolvency Proceedings Practice Direction;

8

(b) Insofar as any part of the property or assets of the Company are found or held to be relevant funds or trust property then the Joint Managers shall be entitled to be paid and to retain such sum or sums from those assets as the Court should think fit by way of remuneration, disbursements and expenses including their expenses in connection with the investigation and administration of such relevant funds and/or the trusts affecting the property;

(c) otherwise, the Joint Manager's approved remuneration, costs, expenses and disbursements are to be paid from the assets of the Company;

(d) upon their discharge, the Joint Managers may retain or pay into Court sufficient sum from the assets of the Company (and/or from relevant funds) to pay their estimated and outstanding remuneration, costs, expenses and disbursement pending determination and/or allocation as provided above

10. The Joint Managers are to have the following further powers:

(1) To be at liberty to retain and pay or dismiss employees (including any person employed under a contract for services) at their discretion.

(2) To be at liberty to terminate, complete or perfect as advised any contracts or transactions relating to the business of the Company or involving transactions relating to assets of the Company including any relevant funds insofar as it is necessary for the protection of assets of the Company or the protection of relevant funds.

(3) To be at liberty to enter into agreements with third parties for the provision of services to the Company.

(4) To engage and retain and/or employ such solicitors, counsel, lawyers, accountants, and other qualified agents and specialists as may be necessary or desirable to assist them in the carrying out of their duties and the exercise of their powers under this Order and to enter into agreements for the payment of their fees.

9

(5) To give such indemnity or cross-undertaking in damages as may be necessary or required in connection with any action or other legal proceedings, whether in the names of the Joint Managers (or either of them) or in the name of the Company.

(6) To intervene in any legal proceedings relating to the affairs and/or business of the Company.

(7) To present a petition for, and/or rank and claim in the bankruptcy, liquidation or other insolvency proceedings of any person indebted to the Company.

(8) To retain and continue to operate the existing bank accounts, safeguarding accounts and relevant funds accounts of the Company and to open and operate such further accounts (as appropriate) with liberty to pay therefrom any necessary expenses incurred on behalf of the Company in carrying out their powers and duties under this Order, any balance exceeding immediate requirements to earn interest with such banks on deposit accounts.

(9) To terminate or continue on behalf of the Company any lease, tenancy, agreement for a tenancy or licence to occupy property which the Company has entered into.

(10) To redirect the electronic mail accounts and postal addresses used by the Company as may be necessary.

(11) To establish, to continue to operate, or to close, redirect, change or otherwise control, any internet web site or other digital media, network or systems in the name of the Company or used by the Company under another name.

(12) To take possession of and secure any computer, laptop computer, tablet, mobile phone or similar device (including, without limitation, any multi-factor authentication device) ("a Device") reasonably appearing to the Joint Managers to be property of the Company or for which rental payments have been paid by the Company or to be reasonably likely to have stored in its memory data relevant to the Company or its affairs (including emails, text or other digital or instant messages, records of telephone calls, documents stored in digital form, passwords, access credentials, tokens and encryption keys).

(13)    The Joint Managers may copy from any Device taken into their possession pursuant to paragraph (l2) above any data appearing to them to be reasonably likely to be relevant to the Company or its affairs ("Relevant Data"). They are to safeguard and subject to paragraph (14) below, keep confidential, any personal information which they may identify on a Device save insofar as such information is relevant to the Company or its affairs. If following review by the Joint Managers a Device does not appear to be property of the Company or to have been paid for by the Company, and does not appear to have any Relevant Data stored upon it, that Device is to be returned to the person from whom it has been retained.

(14)    If upon review, the Joint Managers form the view that Relevant Data which has been copied in fact contains information in respect of which a third-party is or appears likely to be entitled to rely on legal privilege, they are either to delete that material or to arrange for independent review of the material and to delete any materials which are found to be subject to the legal privilege of a third-party, without reading, copying or making any other use of the material.

(15)    Paragraph (13) above does not impede the Joint Managers from disclosing Relevant Data or personal information obtained from any Device to the FCA or the Police or other regulatory agency, or insofar as they may be required to disclose any information or document by any rule of law or order of a court of competent jurisdiction.

(16)    The Joint Managers have liberty to apply to Court, with or without notice to any other person, for directions in connection with their functions and powers under this Order, including (for the avoidance of doubt) in circumstances where the Joint Managers are unable to discharge their functions and/or if they do not (or foreseeably will not) have sufficient funding to do so;

(17)    The Joint Managers shall have the power to do all other things incidental to the foregoing powers.

11